# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
February 11, 2015 Session

## STATE OF TENNESSEE v. GARY SULO ALTO

**Appeal from the Circuit Court for Marion County**
**No. 9397-B     Thomas W. Graham, Judge**

---

### No. M2014-01159-CCA-R3-CD - Filed April 24, 2015

---

Gary Sulo Alto ("the Defendant") pleaded guilty to theft of property valued at $10,000 but less than $60,000. After a sentencing hearing, the trial court denied alternative sentencing and ordered restitution in the amount of $60,000. On appeal, the Defendant argues that (1) the trial court erred when it denied alternative sentencing and (2) the trial court erred when it ordered restitution in the amount of $60,000 without considering the Defendant's future ability to pay. Upon review, we affirm the trial court's denial of alternative sentencing. However, because the trial court failed to make findings as to the Defendant's future ability to pay restitution, and based on the record, we reduce the restitution from the ordered amount of $60,000 to $27,000 and affirm the judgment as to restitution as modified.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed as Modified

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Martin J. Levitt, Chattanooga, Tennessee, for the appellant, Gary Sulo Alto.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; J. Michael Taylor, District Attorney General; and Sherry Shelton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

The Defendant was indicted, along with three other co-defendants, for one count of theft of property valued at $250,000 or more and one count of conspiracy to commit theft of property valued at $250,000 or more. Pursuant to a plea agreement, the Defendant pleaded guilty to theft of property valued at $10,000 or more but less than $60,000, a Class C felony. He also agreed to a six-year sentence with the manner of service and restitution between $10,000 and $60,000 to be determined by the trial court.

At the sentencing hearing, Sergeant Matthew Minter of the Tennessee Highway Patrol explained the conspiracy. In 2012, Sergeant Minter began an investigation to determine whether bushling scrap metal was being stolen from Progressive Rail Services ("PRS") in New Hope, Tennessee. PRS had conducted their own investigation prior to contacting police and discovered a theft scheme in which two truckloads of bushling were to be delivered to the PRS facility from A.O. Smith in Ashland City, but only one truck of bushling would be taken to the PRS facility and weighed twice to make it appear as if two trucks had delivered loads to PRS. The other truck would go to Dodson's scrapyard ("Dodson's") in Whitwell, Tennessee. From there, the scrap metal was sold to Thornton Iron and Metal ("Thornton") in Rainsville, Alabama.

The investigation concluded that one of the co-defendants, Jay Sanders, was the driver who would take the load to Dodson's. During his interview with Sergeant Minter, Mr. Sanders identified the Defendant as the person who drove the second truck to PRS and weighed it twice. The Defendant would weigh his truck once and then move one axle off the scale so that the second weighing would differ slightly from the first. In order to avoid detection, Mr. Sanders bribed some of the workers at the PRS yard to give them a "coast-is-clear" to double-weigh the truck. These weigh-ins often happened after hours because Mr. Sanders had a key to the PRS facility. The Defendant had to have Mr. Sanders' original weigh ticket from A.O. Smith in order to double-weigh his truck and mark the weight on Mr. Sanders' ticket. The weigh tickets were important because those tickets would be returned to the Defendant's employer, SCS Trucking ("SCS"). SCS would then bill PRS. Sergeant Minter stated that the handwriting on "a large number of tickets" indicated that the same person was filling out the tickets.

Sergeant Minter stated that PRS noticed several "red flags" about the weigh tickets, including that the time between the weighings was too short for two trucks to pull in and out of the scales. Additionally, after PRS became suspicious of the scheme, they installed a video camera at the scales and recorded the Defendant double-weighing a truck.

-2-

The State summarized a portion of Sergeant Minter's interview with Mr. Sanders where he explained how he paid the Defendant. Mr. Sanders either paid the Defendant five cents per pound, split five cents per pound with him, or would give the Defendant a "little less than half" of what Mr. Sanders received from Dodson's. The price of each load varied between $5,000 and $8,000. From his half, Mr. Sanders paid the Defendant and other individuals. Mr. Sanders said when the Defendant stopped hauling for A.O. Smith, he carried on the scheme without him. Mr. Sanders admitted that he had come up with the scheme and that it had lasted more than two years.

Sergeant Minter attempted to interview the Defendant during his investigation, but the Defendant told Sergeant Minter, "[Y]ou've already talked to Jay Sanders, you know the deal so there's no need to talk to me." Similarly, the Defendant chose not to make a statement in the presentence report.

On cross-examination, Sergeant Minter confirmed that the co-defendants from Dodson's had never met the Defendant and that Mr. Sanders was the only person who made deliveries to their scrapyard. However, the Defendant knew that Mr. Sanders was not delivering some of his loads to PRS. Also, according to Mr. Sanders' statement, "double dipping tickets" was the primary way the scheme operated. He also confirmed that the Defendant delivered some "legitimate loads" where he did not double weigh his truck and that he drove a route for Volkswagen during the time frame of the scheme.

Ten people wrote letters to the court on the Defendant's behalf and several others testified in his support at the sentencing hearing. Victor Harris testified that he served in the Coast Guard with the Defendant in the 1970s and they have been friends ever since. After the Defendant was discharged, he lived with Mr. Harris. Mr. Harris taught the Defendant how to drive a truck and helped him find a job. Mr. Harris stated that he never had a problem with the Defendant. He considered the Defendant one of his best friends and said, "He's the type of person that if he knows you need something or you're in a bind or anyway, you don't have to ask, he'll always be there to help you."

Lisa Davis, one of the Defendant's step-daughters, testified that the Defendant raised her and her two sisters. When Ms. Davis lived in Alabama, her husband had health problems and Ms. Davis could not care for him on her own, so the Defendant came to Alabama to help her. After Ms. Davis's husband died, the Defendant gave her a plot for her husband's burial and helped pay for the funeral services. The Defendant also helped Ms. Davis's son move because no one else could drive the moving truck. The Defendant brought Ms. Davis wood for her fireplace in the middle of the winter without being asked. Additionally, Ms. Davis's mother, the Defendant's wife, had always suffered from health issues. She had undergone open-heart surgery and battled cancer, and the Defendant had always cared for her. He

would take her to the hospital, stay with her in the hospital, and take her to follow-up treatments. Ms. Davis confirmed that, at the time of the hearing, her mother was in the hospital.

Steven Skiles testified that he owned SCS Trucking. He had known the Defendant since 1975 and considered him to be a good friend. The Defendant's wife had been sick, and the Defendant had taken off from work to take care of her, but that he could return to his job at SCS when he was able. Mr. Skiles explained:

> Well, if I'm the owner of a business and a man gets in trouble, I try to weigh what's what and who is what and what he can drive and what he can't do. I talked to [Sergeant] Minter and he explained all I needed to know, and then I, I've dismissed Jay Sanders wholeheartedly and I've tried to take care of [the Defendant.]

Mr. Skiles also stated that, during the investigation, Caterpillar, Inc.'s[1] security had called him to inform him that his drivers were involved in the scheme but that he had been "cleared" of any wrongdoing. Even though Mr. Skiles knew the Defendant received money from this scheme, Mr. Skiles said that he "absolutely" still considered the Defendant to be an honest man. Mr. Skiles stated, "Anything that happened was a mistake on his part as far as I'm concerned, and I'm one hundred percent on his side."

Mr. Skiles stated that the Defendant has worked for SCS for 10 years. During that time, his "regular haul" was for Volkswagen, but he did some hauling from A.O. Smith to PRS. When asked if the Defendant hauled "hundreds of loads" from A.O. Smith, Mr. Skiles said, "I wouldn't think he done that many." However, Mr. Skiles also admitted that he had not reviewed the weigh tickets to try to figure out how his employees managed to carry out the theft scheme.

Mr. Skiles confirmed that it was common practice for one driver to sign another driver's weigh ticket. The fact that two weigh tickets were signed by the same person did not necessarily mean that anything was illegitimate or wrong.

The Defendant testified that he was 62 years old and, except for some speeding tickets from several years prior, he had never been convicted of any crime. He grew up in Minnesota and still had family there. After he graduated from high school, the Defendant served in the U.S. Coast Guard on active duty for fours years and on reserve duty for two. After his service, he was honorably discharged and moved to Marion County. He learned

---

[1] PRS is a wholly-owned subsidiary of Caterpillar, Inc.

to drive a truck and has maintained steady employment for most of his adult life. He stated that he did not have any drug or alcohol problems, and his only health issues were "a bad shoulder and a leg goes numb off and on." The Defendant confirmed that he still works part-time for Mr. Skiles at SCS Trucking.

The Defendant raised three step-daughters, and all of them were present at the hearing to support him. Their mother, the Defendant's wife, was in the hospital at the time of the hearing. The Defendant stated that he tries to "take care of her the best [he] can."

The Defendant began working at SCS in September of 2009. In mid-2010, the Defendant began driving the A.O. Smith route. When he was driving that route, he usually would haul two loads from A.O. Smith a day, but not every load was delivered to PRS. Sometimes the Defendant would haul baling scrap metal to a facility in Gallatin. Other times he would haul bushling to PRS.

Whenever the Defendant double-weighed a load, Mr. Sanders would pay the Defendant $500. According to the Defendant, Mr. Sanders told him that the amount he was paid was based on the weight of the load, but the Defendant did not view his compensation as being contingent on the weight of the load. He stated, "[Mr. Sanders] just give [sic] me $500[,] and I'd make two tickets out." When he started hauling loads for Volkswagen in 2011, the Defendant virtually stopped hauling loads from A.O. Smith. After Caterpillar, Inc. began their initial investigation of the scheme, the Defendant was observed on a security video double-weighing his truck. He estimated that, after the initial investigation began, he hauled two loads in connection with the scheme.

The Defendant said he did not double-weigh trucks for Mr. Sanders very many times. He explained, "I told him I don't need to do this. You know, I didn't tell on him, but I just told him I didn't need to do it." The Defendant estimated that Mr. Sanders paid him $10,000 for his participation in the scheme. At $500 a load, that came to 20 loads.

The Defendant explained that he often signed multiple tickets for legitimate loads. A driver would weigh his truck and then drive into the yard to unload it. The Defendant would then sign the driver's ticket as well as his own. Such practice was common among the drivers.

The Defendant spent the money he got from the scheme on medicine for his wife. The Defendant owned a 1977 model double-wide trailer, a 1995 pickup, and a 2002 Harley Davidson motorcycle. He went on a vacation to Sturgis because he had always wanted to go. Regarding Sturgis, the Defendant said, "I don't care if I'm half broke, I'm going to go."

The Defendant said he understood that he would have to pay restitution and expressed willingness to do so. He confirmed that, apart from his involvement in this scheme, he had been a law-abiding citizen. He informed the court that he was ashamed of what had happened and felt like he "let a lot of people down."

On cross-examination, the Defendant confirmed that he had signed several weigh tickets, but he maintained that he only double-weighed 20 loads for Mr. Sanders. The Defendant also confirmed that he was the person pictured on PRS's security video double-weighing a truck. The Defendant explained that Mr. Sanders took several loads directly from A.O. Smith to Dodson's without the Defendant's help. Mr. Sanders would decide "by random" which loads the Defendant would double-weigh to make it appear as if Mr. Sanders had delivered a truck load to PRS. On those trips, the Defendant would get Mr. Sanders' weigh ticket after they had left A.O. Smith and would return that ticket to him the next morning. Upon return of the ticket, Mr. Sanders would pay the Defendant $500.

The Defendant first became involved in the scheme in September 2010, and he was still double-weighing trucks in June 2012. He explained to the trial court,

> [Mr. Sanders] asked me, said, ["]Do you want to make a trip["] and I said no. We really don't need to be doing this. You know, that's–of course, I give in and do it at times. I didn't do it ever[y] day or ever[y] week. You know, I didn't do it ever[y] day.

The Defendant stated that he did not keep track of when he double-weighed the trucks.

The Defendant admitted that he had reached a settlement with the Internal Revenue Service ("IRS") regarding taxes due on unreported income. According to the Defendant, the IRS "accused" him of making $27,000 in unreported income. In order to avoid litigation, the Defendant entered a settlement agreeing to pay $6,000.[2]

The Defendant confirmed that he knew what was going on, but he maintained that he was not involved in the majority of the scheme. He also explained that he did not make a statement to investigators because he wanted to speak with a lawyer first. He also admitted

---

[2] The amount of the settlement agreement is somewhat unclear from the Defendant's testimony. He stated, "I had to pay them $11,000. They got one of them statements there I had to give them $6,000, and they told me I could get payments and I have made payments for probably four months . . . ." The technical record includes a Billing Summary from the IRS. According to that summary, the Defendant's tax increased by $9,019.00. He incurred an "accuracy-related penalty or underpayments penalty" in the amount of $1,803.80, and an interest payment of $581.84. His account was credited with a balance of $5,275.00. Therefore, the amount the Defendant was required to pay to the IRS was $6,129.64.

that he did not give a statement for the presentence report. Regarding his actions, the Defendant said, "I'm sorry, but I mean—I'm sorry I let everybody down. You know, I just, I made a mistake."

On redirect, the Defendant stated that he did not keep records. He did not know how much money he actually got from the scheme and was just guessing as to the amount he was paid. However, he maintained that he was driving more than one route during the time the scheme was in operation.

The trial court noted that the Defendant was only involved in the scheme during a part of its operation. But even if he was not directly involved in helping transport the stolen loads, the court reasoned that he was indirectly involved in every load because he did not report it. The court stated:

> I don't know how the IRS comes into all this, but if he's accepting he had unreported income of $26,000 [sic] and it was based on payments of $500 each, then we've got over 50 loads right there just on that. I don't know how st[r]ong that is, but it's many loads, and his direct involvement would be well over $100,000 . . . and his indirect involvement is [two] [m]illion [d]ollars.

The trial court recognized that, based on the statute, the Defendant was presumed to be a good candidate for probation, but it concluded there was "plenty of evidence" to support denying an alternative sentence. The trial court stated that it did not believe the Defendant was truly sorry for what he did. Instead, the court opined, "I think he's sorry that he made the mistake and got caught, but he did not demonstrate that he was really sorry to anybody . . . ." Also, the trial court noted that, even though the Defendant's employer testified on his behalf, the Defendant's action could have exposed Mr. Skiles and SCS to liability. Finally, the court noted that the scheme operated for an extended period of time and included "many, many, many thefts, and misstatements of fact that ultimately cause great loss in this case."

The trial court then turned to the confinement considerations. It first considered whether the Defendant had a long history of criminal conduct. The trial court noted that the scheme operated for a long time and included many thefts. However, it expressed doubt as to whether "criminal conduct" included conduct that was involved in the indicted offense. Nevertheless, the trial court concluded that "it is evidence that does not support immediate probation." Additionally, the trial court unequivocally found that confinement was necessary to avoid depreciating the seriousness of the offense and that it was "a serious breach of the public trust to take funds in this manner. Certainly it's a breach of trust to his employer and to anybody else dealing with him."

The trial court recognized that the Defendant had a positive social history, including his dedication to his family, but it concluded that those positive attributes did not outweigh the Defendant's breach of trust. While the Defendant was not the leader of the scheme, he was more involved than some other individuals. Further, the trial court opined:

> I don't think that [the Defendant's] statement on the stand shows that he really fully understands how serious and how bad this situation was. I think he kind of marks it off as, you know, I shouldn't have done it, but still everybody else was, and now he feels sorry for it, but that's not quite a real solid statement of remorse as far as I'm concerned.

Taking into account the purpose and principles of sentencing and relying primarily on the seriousness of the offense, the trial court ordered the Defendant to serve his six-year sentence in the custody of the Department of Correction.

> As to restitution, the following exchange occurred:
>
> STATE: Judge, the only other issue would be a restitution, and I think the Court has addressed that in the other sentencing. We're limited in this case–well, up to a max of $60,000, I think by the plea agreement.
>
> COURT: Well, the proof is, under his own words, that he got at least 20–he was involved in at least 20 loads and maybe based on the IRS, may have been 50 loads, but at 20 loads the amount of loss that was caused by his action is way over $100,000, so the [$]60,000 would certainly be way less than anything that would remotely relate to really how serious the consequences were for the victim in the case, so I mean, you can put that down now. That's been established.

The Defendant made no objection to the amount of restitution at the hearing. This timely appeal followed.

## II. Analysis

We first note that the record on appeal does not contain a transcript of the Defendant's guilty plea. However, the transcript from the sentencing hearing is adequate to allow for meaningful review. Therefore, we will review the appeal on its merits and presume that the missing guilty plea transcript would support the ruling of the trial court. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012).

On appeal, the Defendant argues that the trial court abused its discretion by ordering the sentence to be served even though the Defendant was considered a favorable candidate for an alternative sentence under Tennessee Code Annotated section 40-35-102(6). The Defendant notes that he had a consistent work record; he had no prior criminal record; he had served in the military; he was caring for his "cancer-stricken" wife and at least part of his crime was motivated by the desire to buy her medicine; and he expressed remorse and willingness to pay restitution. The Defendant contends that the trial court ignored these positive factors due to the enormity of the scheme. Finally, the Defendant notes that the trial court cited two cases in which one defendant was a public employee and the other embezzled money from its employer. The Defendant argued that the trial court erred in relying on those cases because, in this case, he stole money from PRS, not his employer. The State argues that the trial court did not abuse its discretion by denying alternative sentencing. Further, the State contends that the comparison of this case to prior embezzlement cases was not in error because the Defendant's actions exposed SCS to potential liability.

Pursuant to Tennessee Code Annotated section 40-35-103, "[e]very defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(3) (2010). Further, in recognition of the fact that state prison capacities and resources are limited, "felons convicted of the most severe offenses, possessing criminal histories evincing a clear disregard for the law and morals of society and evincing failure of past efforts at rehabilitation" are given first priority for sentences of incarceration. Tenn. Code Ann. § 40-35-102(5) (2010). Conversely, especially mitigated or standard offenders convicted of a Class C, D, or E felony are presumed to be favorable candidates for alternative sentencing. Tenn. Code Ann. § 40-35-102(6)(A) (2010), Sentencing Comm'n Cmts. However, this presumption can be overcome by "evidence to the contrary." Tenn. Code Ann. § 40-35-102(6)(A).

Under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (2010).  Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purpose for which the sentence is imposed."  Tenn. Code Ann. § 40-35-103(2), (4) (2010).

To determine the proper sentence, the trial court must consider any evidence received at the sentencing hearing, the presentence report, the principles of sentencing, arguments of counsel as to sentencing alternatives, the nature and characteristics of the offense, any applicable enhancing or mitigating factors, any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, and any statement the defendant wishes to make on his own behalf.  Tenn. Code Ann. § 40-35-210(b)(1)-(7) (2010).

In the instant case, the trial court conducted a sentencing hearing in which numerous witnesses testified. The trial court reviewed the purposes of the Sentencing Act outlined in Tennessee Code Annotated section 40-35-102 and placed on the record the factors it considered and its reasons for imposing a sentence of incarceration.  The trial court applied the sentencing principles outlined in Tennessee Code Annotated section 40-35-103, and found pursuant to subsection 103(1)(B) that "confinement was necessary to avoid depreciating the seriousness of the offense" and "confinement is particularly suited to provide an effective deterrence to others likely to commit similar crimes." The trial court recognized that the Defendant was presumed to be a favorable candidate for alternative sentencing.  See Tenn. Code Ann. § 40-35-102(6)(A)(2010).  However, the trial court concluded that the Defendant's  apparent lack of remorse and the length and seriousness of the crime was "evidence to the contrary" which weighed against granting an alternative sentence.  Additionally, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offense, a complex conspiracy involving several individuals, including the Defendant, and resulting in the theft of over a million dollars.  Finally, the trial court noted that, as a Range I offender, the Defendant would be eligible for release in a little less than two years.

The 2005 amendments to the Tennessee Criminal Sentencing Reform Act of 1989 ("the Sentencing Act") "vested the trial court with broad discretionary authority in the imposition of sentences." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012).  When a defendant challenges the manner of service of a sentence, this Court reviews the trial court's decision under the abuse of discretion standard, accompanied by a presumption of reasonableness.  Caudle, 388 S.W.3d at 278-79.  As long as the trial court's sentence is consistent with the purposes and principles of sentencing, the denial of an alternative sentence should be upheld.  Id.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2010); Bise, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." Bise, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-45-401 (2010), Sentencing Comm'n Cmts.

In this case, the trial court stated on the record the factors it considered and the reasons for denying an alternative sentence. The Defendant has not proven that the trial court abused its discretion or overcome the presumption that the sentence was reasonable. We affirm the trial court's denial of an alternative sentence.

Finally, we are not persuaded by the Defendant's argument that the trial court erred when it cited two previous embezzlement cases. When referencing those two cases, the trial court stated,

> I don't know what's happening to people, but I've had several substantial embezzlement cases, you know, involving people with no previous criminal record, but the embezzlement schemes were long and hard . . . It is a serious breach of public trust to take funds in this manner. Certainly it's a breach of trust to his employer and to anybody else dealing with him.

It appears that the trial court referenced the two previous cases to illustrate how defendants involved in embezzlement schemes breach the trust of others. The trial court did not rely on the employer-employee relationship of the defendants and victims in the prior cases to make this point. Further, in this case, the Defendant was entrusted with valuable inventory as it was being transported from A.O. Smith to PRS, and he breached that trust by participating in the scheme. It is irrelevant that the Defendant was not employed by PRS; he still breached the trust placed in him. Therefore, it was not error for the trial court to reference these prior cases.

*Restitution*

Second, the Defendant argues that the trial court erred by not setting a specific restitution amount or considering the Defendant's ability to pay. The State argues that the Defendant failed to present his ability to pay as an issue to the trial court and, therefore, the issue is waived.

As an initial matter, we disagree with the Defendant's assertion that the trial court failed to set a specific restitution amount. At the conclusion of the hearing the trial court considered the amount of loss directly caused by the Defendant's actions and stated, "[S]o the [$]60,000 would certainly be way less than anything that would remotely relate to really how serious the consequences were for the victim in the case, so I mean, you can put that down now." The judgment reflects $60,000 as the restitution amount. Nothing in the record indicates that the trial court intended to amend the restitution amount at a later date. Therefore, we conclude that the trial court set restitution at $60,000.

The Tennessee Supreme Court has not yet addressed what impact, if any, Bise has on our review of restitution orders, but we have previously applied an abuse of discretion standard with a presumption of reasonableness. State v. David Allan Bohanon, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *5 (Tenn. Crim. App. Oct. 25, 2013).

Restitution is mandatory in all theft convictions. See Tenn. Code Ann. § 40-20-116(a) (2012); David Allan Bohanon, 2013 WL 5777254, at *5. "The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." State v. Johnson, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997). Tennessee courts are encouraged to order restitution when appropriate, Tenn. Code Ann. §§ 40-35-102(3)(D), -103(6), but trial courts "are without inherent power or authority to order payment of restitution except as is derived from legislative enactment." State v. Alford, 970 S.W.2d 944, 945 (Tenn. 1998).

Trial courts have authority to order confinement in conjunction with restitution. Tenn. Code Ann. § 40-35-104(c)(2), (8) (2010); State v. William Chandler Daniels, No. E2009-02172-CCA-R3-CD, 2010 WL 5343776, at *2 (Tenn. Crim. App. Dec. 23, 2010). However, orders of restitution, including orders issued pursuant to section 40-35-104(c)(2), must follow the procedure outlined in Tennessee Code Annotated section 40-35-304. See Tenn. Code Ann. § 40-35-304(g) (2010); State v. Brigitte Pauli, No. M2002-01607-CCA-R3-CD, 2003 WL 21302991, at *18 (Tenn. Crim. App. June 5, 2003). When determining the amount and method of payment, the trial court must consider "the financial resources and the future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d) (2010). Additionally, "[t]he court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments." Tenn. Code Ann. § 40-35-304(c) (2010). Once ordered to pay restitution, the defendant is "responsible for the payment of restitution until the expiration of the sentence imposed by the court, and any payment or performance schedule established by the court shall not extend beyond the expiration date." Tenn. Code Ann. § 40-35-304(g)(2) (2010).

We conclude that the Defendant did not waive the issue of his ability to pay restitution by failing to raise the issue or to contemporaneously object to the restitution amount during the sentencing hearing. The language of the statute governing restitution imposes mandatory duties on the trial court. See Tenn. Code Ann. § 40-35-304 (2010). One of these mandatory duties includes determining "the financial resources and the future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d) (2010). Therefore, any failure to follow the procedure outlined in that statute was not waived by the Defendant's failure to object to the restitution amount during the sentencing hearing

Based on the testimony of Sergeant Minter, Mr. Sanders either paid the Defendant five cents per pound, split five cents per pound with him, or would give the Defendant a "little less than half" of what Mr. Sanders received from Dodson's. The Defendant testified he was involved in twenty loads and was paid $500 per load. It is evident from the record that the trial court attempted to determine how much money the Defendant directly received from his involvement in the scheme and how much of PRS's loss could be attributed to the amount received by the Defendant. Further, the record contains descriptions of the Defendant's assets and obligations. However, the trial court made no findings as to the Defendant's future ability to pay as required by Tennessee Code Annotated section 40-35-304(d). We acknowledge that the victim suffered tremendous financial losses in this scheme in which the Defendant was a willing participant. However, because of the uncertainty in the testimony regarding the amount of the ill-gotten gains the Defendant received and the lack of evidence regarding the Defendant's ability to pay, we modify the restitution amount based on the proof in the record. See State v. Joy Schmidt, No. 02C01-9710-CR-00395, 1999 WL 360170, at *2 (Tenn. Crim. App. June 7, 1999). The IRS concluded that the Defendant made $27,000 in unreported income over the course of the scheme. The Defendant entered a settlement agreement with the IRS and agreed to pay taxes for the $27,000 in unreported income. Additionally, although the Defendant does not have many assets, he does own a 2002 Harley Davidson motorcycle, which is not necessary for the Defendant's transportation. He also has the ability to work and to earn an income upon his release, and a prior employer, SCS Trucking, that appears willing to offer him a job. Based on the record before us, the Defendant has sufficient resources and the future ability to pay restitution in the amount of $27,000 during the term of his sentence.

### Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed as modified. The amount of restitution is modified to $27,000.

_____
ROBERT L. HOLLOWAY, JR., JUDGE
